six days to make it. It's gonna be this huge ordeal, you just need to relax a little bit, you need some fucking Xanax.  Because you drive me fucking nuts. You gotta relax a little bit, dude. If the guy has the money, and I'm going to meet Steve with the money, it's not, it's no issues, there's not, we're not expecting another five feet of snow, you know.

BERTANZA:        Yeah, but, but, but, but, but, but, okay, okay, that's one aspect of it, another aspect of it is, hey Alex, yeah, yeah, ya I know I got those first things you wanted at 3:00, I'll, I'll meet you in 45 minutes, and at 6:30 and fucking well Mark where the fuck are ya, you know, well how come, ya know, well, where ya been, it's three hours, you live 45 minutes away, you said you were on your way, ya know, I mean, ya      know, well, ya aren't, so you gotta look at it from a little different aspect of it, I understand what you're saying, your defending whatever the fuck but you also gotta look at it you know, a little, you know, it you know, it's fucking, if I did that to you, you'd fucking, fucking, you know, that'd be fucked up, you don't doshit like that.

KENYHERCZ:       Yeah

BERTANZA:        That's all I'm saying, you know fucking, yeah, you know, yeah dude, okay, I got 100 loads, yeah, I got somebody who wants them,  yeah Lou wants them, alright, we'll meet, I'll meet you and Lou at the fucking       Big Y, okay, hour, two hours, well what the fuck man, your making me look stoogie on me, look at that.  Think about it that way.

KENYHERCZ:       Yeah.

BERTANZA:         Got Lou fucking, fucking nodding off, fucking bitchin' at you, you know, picture it like that, now all of a sudden fucking, who's overreacting.

KENYHERCZ:       Well.

BERTANZA:        So, alright but, like I said, I'll fucking, I'll talk to this guy and we'll go from there, alright.

KENYHERCZ:       Like I said man, on your end, like I.said, I don't care but make sure, they are, you know a prescription Cialis is a pharmacy, I read that um, that they are not a prescription, but they are 50 bucks for 100 milligram tab, so make your money off of it. You know what I mean?

BERTANZA:        Well it's not really so much that, well yeah, I mean you know, a few bucks, I mean you don't, you don't rape people because fucking, it would make it tough for them to keep coming back.

KENYHERCZ:     You don't have to rape people, but I mean regardless, I mean, as long, if your person is below $5.00 it's the best price that anybody is gonna get anywhere. You know what I mean? And you're not raping em, you know what I mean?

BERTANZA:      Yeah, alright, um I'll, I'll talk to you later about it, give me a call when you're done working alright.

KENYHERCZ:     Yeah, alright you got it.

BERTANZA:      Alright later

KENYHERCZ:     Alright later


99.     Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, BERTANZA asked KENYHERCZ for the "biggest order of fucking Cialis," a non-controlled substance obtainable only with a prescription that is intended to treat erectile dysfunction, for a definite purchaser ("serious guy"). KENYHERCZ explained that his supplier, "Steve," whom agents know to be SANTUCCI, produced bottles of Cialis with ten pills or "big bottles of 150." KENYHERCZ continued that SANTUCCI also had Viagra, a prescription medication intended to treat erectile dysfunction and a mixture of Cialis and Viagra ("50 milligram, 25 of each") that SANTUCCI described as a "cock bomb." KENYHERCZ believed that SANTUCCI had "enough powder" to produce 2,000 tablets ("tabs") of each, and related that he had just spoken to SANTUCCI about that subject the night before. The two then discussed the amount of money they would charge for brokering the deal, and BERTANZA indicated that he was "worried" because the last time SANTUCCI ("Steve") supplied them, they had problems (referencing January 27, 2015, when SANTUCCI had a flat tire on his Prius when he attempted to supply KENYHERCZ and BERTANZA with

steroids to sell to the DEA Cooperating Witness).  KENYHERCZ reminded BERTANZA that the previous times SANTUCCI ("Steve") had supplied them, "it was flawless" and that it would not take SANTUCCI "six days to make" a bottle or two of Cialis and the area would not be "expecting another five feet of snow."  KENYHERCZ then tells BERTANZA to "make your money off" the sale, and reminds him that he does not have to make an inordinate amount of profit from the sale ("rape people").

100.    Later that day, in KENYHERCZ Session 37, KENYHERCZ, utilizing the KENYHERCZ Telephone, called BERTANZA, who was utilizing the BERTANZA Telephone, and engaged in the following conversation:

| | |
|---|---|
| BERTANZA: | Hello |
| KENYHERCZ: | Hey what are you doing? |
| BERTANZA: | Taking a shit and then I'm taking a nap. |
| KENYHERCZ: | Nice, that's the way to do it. |
| BERTANZA: | Yup, just got home I'm going to nap for a little while then go out and finish plowing. |
| KENYHERCZ: | Yeah, I don't know I mean its stopped now but I don't know how long if we're supposed to get more or what. |
| BERTANZA: | Who knows, all I know is I've been up since two am, I need to close the eyes for a little while. |
| KENYHERCZ: | Yeah, no I hear you. |
| BERTANZA: | Fucking newspaper shit killed me but you know what its money and fucking I'm making it and (UI) having the plow, a plow, a plow, I paid off my truck, I've fucking got two new vehicles I'm fucking making moves so I just gotta keep it going you know? |
| KENYHERCZ: | Yup, yup, I fucking (UI) I hear you. |
| BERTANZA: | That's what I'm saying we need to fucking, I've got a guy that's willing to invest, but we need to get some bottle service going, but to start off you know a couple hundred of those things so what I just need you to do is, I |

just need you to talk to him and find out when, and you know obviously I'll take care of you, you know, you give me your price and I appreciate that and I'll split the profits with you, that's all, you know how we do it.

KENYHERCZ: All right man, (UI) yeah, yeah, like I said dude I'm not, you know I'm not like some people. I mean fucking some people fucking charge you fucking 75, 8- you know its not worth it. You know what I mean?   I'd rather just be honest with you let you know that we, we, we you know take care of it, we handle it, you know.

BERTANZA: You know, if I got it it's yours, if you got it it's mine, I get it I know how it works.

KENYHERCZ: You know so I mean, it helps us out on long runs. You know what I mean? It brings me more business to him, which gives me more you know, you know, not credibility, but gives me more, you know, it just works out for everybody so, like I said, we'll buy, I'm going to throw with you, you know what I pay, then we just make it happen. You know?

BERTANZA: Let me know when it could happen so that I could let him know, and then we could fucking go from there.

KENYHERCZ: Yup, yeah, like I said I already sent him a message I'm just waiting for a, for a text back and then we'll go.

BERTANZA: (UI) Go smooth I might be able to have an investor, that fucking, you know, spot me a few g's and you know, we could pick up a hundred, a hundred and fifty fucking oils, bottles of oils so you know, I, I get 'em, I sit on 'em cheap, and you know, I'm fucking paying $40 a bottle I'm going to fucking, I'll sit on 'em I'll fucking sell 'em, fucking over the next six months for $80 a bottle, double the fucking money, but you know it's, it's not going to go all at once, you know what I'm saying?

KENYHERCZ: Yeah.

BERTANZA: It's going to piece out but at least I'll have it in stock and then I'll be back in business.

KENYHERCZ: Well I used to have the luxury, I used to have the luxury to do that, but you know.

BERTANZA: I remember those days. That's when I was living with you.

KENYHERCZ: And dude I had, I had, I had everything, I had everything, a beautiful apartment, brand new car, you know.

BERTANZA: It's time, so like I said I got to shut my eyes for a little while.

KENYHERCZ: All right well I got, I got something that just came up, it's an easy g note if, if you want in on it.

BERTANZA: What?

KENYHERCZ: I just, this guy just needs to, he needs to know that it's not good to fucking run his mouth so.

BERTANZA: Okay. What?

KENYHERCZ: I said, I just have to make a point to, you know, to a gentleman who talks too fucking much.

BERTANZA: Why? What happened?

KENYHERCZ: No it's, it's for a friend of mine that you know I do some work for and it basically, the, the guy that needs a talking to, his daughter's a fucking crack whore basically, fucking, sucks dick for dope and shit like that and now, you know, he's trying to hem this kid's son up on fucking rape charges and you know.

BERTANZA: Who is it, do I know him?

KENYHERCZ: No, no, this is, this is coming from a buddy of mine down in Stamford. I mean the guy, the guy, the guy, you know is in, is in Milford, but I don't, I don't think you know him. He's just a 55 year old fucking drunk, so I throw the boots to him a couple times and maybe he fucking, maybe he works with his hands, maybe you fucking jam up a couple fingers and I get a g note.

BERTANZA: Well.

KENYHERCZ: UI

BERTANZA: Be careful with that. I used to do that, for money, my fucking assault charges and my court fees and fucking you know fucking little time inside ain't really worth it.

KENYHERCZ: No (UI) trust me dude you know, I gotta take care of a couple things.

BERTANZA: (UI) You know, if next times I go in it's, going to be for life, it ain't going to be for something stupid.

KENYHERCZ: Yeah.

BERTANZA: Believed me I past that, I really got to close my eyes, I gotta.

KENYHERCZ: All right brother. I'll let you go.

BERTANZA:          Talk to Steve, talk, talk to Steve, shoot me a text, if I don't hear, if you
                   don't hear, if you don't hear back its because I'm nodded out, I'm walking
                   up around four thirty, five o'clock to go and finish my plowing so I'll, I'll
                   call you back all right?

KENYHERCZ:         All right brother you got it.

BERTANZA:          All right pal, I'll stop by when I'm in the valley too, all right?

KENYHERCZ:         Sounds good.

BERTANZA:          All right, later

101.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, I believe that during this conversation, BERTANZA informs KENYHERCZ that he has a controlled substance purchaser ("guy that's willing to invest") for "hundreds of bottles" of steroids ("bottles of oils") and that he was willing to "split the profits" with KENYHERCZ.   After the two discuss the possible business, KENYHERCZ relates that he has been offered $1,000 ("an easy g note") and wants to see if BERTANZA will help him ("if you want in on it").   KENYHERCZ explains that he has been hired to assault a man ("a gentleman") "who talks too fucking much."   KENYHERCZ adds that the man's daughter has accused the person who is hiring KENYHERCZ's son of raping her ("he's trying to hem this kid's son on fucking rape charges").   KENYHERCZ describes his intended victim as a "55 year old fucking drunk" in Milford, whom he intends to assault ("throw the boots to") and break a few of his fingers ("jam up a couple fingers") to earn the $1,000 ("g note").   BERTANZA cautions KENYHERCZ against that noting that when he did that, the criminal charges ("assault charges"), fines ("court fees") and jail term ("time inside") were not worth the money he made. BERTANZA then reminds KENYHERCZ to speak to SANTUCCI ("talk to Steve") about the large supply of controlled substances.

102.    On March 7, 2015, in KENYHERCZ Session 465, BERTANZA, using the BERTANZA Telephone, calls KENYHERCZ, who was utilizing the KENYHERCZ Telephone, and engaged in the following conversation:

| | |
|---|---|
| BERTANZA: | Fucking. |
| KENYHERCZ: | Hello. |
| BERTANZA: | So much stress. |
| KENYHERCZ: | Hello. |
| BERTANZA: | So that definitely, definitely is a no go.  That's not? |
| KENYHERCZ: | He's he's away until Monday. |
| BERTANZA: | What's that mean, away? |
| KENYHERCZ: | He's he's going away for the weekend, he's gonna be in New York City. |
| BERTANZA: | (sigh) I wish you would have told me that. |
| KENYHERCZ: | I didn't know that til fuckin last last night.  I kept asking him and and it kept getting, and pushed off and pushed off and then we just you you know, he just sent he just sent me a text message at midnight. |
| BERTANZA: | You know what I blame myself I can't even blame you because you don't know any better.  It ha, how, how. |
| KENYHERCZ: | It's not that I don't know any better, you fuckin, you call me you say what time can it happen |
| BERTANZA: | Ah yes, exactly a simple question, what time could it happen, exactly.  A normal question. |
| KENYHERCZ: | Excuse me, when can it happen. |
| BERTANZA: | Yeah. |
| KENYHERCZ: | Steve says 3:00. I say it can happen (UI) clock, I'll let you know.  2:00 comes I don't hear anything, so now I gotta call Steve and say listen 3:00 won't work I'll let you when I hear from 'em.  He's like well I could do 8:00 cause that's when they get home from dinner.  And then 8:00 comes, I don't hear anything from you, so I 'm gonna have to let him know.  Just to let you know now that's it's 10:00, he's like I'm gone until Monday. |

BERTANZA:        Alright. Uh, could it happen on Monday though I mean cause I mean if if not I'm just gonna abandon ship and.

KENYHERCZ:       (chuckles) he had them yesterday, all I had to do was meet him.

BERTANZA:        I know that, but you know what I'm sayin you, you like, you know how like for example you don't have 3 cents to your fucking name, you know what and say like you worked all week and you had to cash a check, you know, so it's like you know for example you know you, you ain't got a dollar to your name so if you were waiting on a check from somebody sometimes it takes a minute to cash the check you get what I'm sayin?

KENYHERCZ:       Yeah.

BERTANZA:        Like, like, like, I don't understand how you don't like, you know, like you know you get things but you don't like you don't think outside the box it's not just a one way you know like you know other people have issues too you know it's not like fuckin everybody's loaded except for you, you know what I mean, like fuckin so you know it's fuckin I, I had to wait on a fucking check to cash, just left the bank you called and fuckin I says you know I'll see what I can do. So, I don't know altright.

KENYHERCZ:       Yeah, you can have it Monday well it's gotta happen Monday he's, I, I.

BERTANZA:        Alright well just by some chance fucking the amazing Steve is still around, give him a call.

KENYHERCZ:       Alright.

BERTANZA:        Just by some chance, the great guy that he is, you know maybe we can do it before he fucking goes to his gay cruise or wherever he fuckin hangs out at alright?

KENYHERCZ:       Alright.

BERTANZA:        So it can happen right now.

KENYHERCZ:       Right.

BERTANZA:        Right.

103.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, I believe that during this telephone call,

BERTANZA ascertains that the controlled substance sale he, KENYHERCZ and SANTUCCI had been planning will be called off ("definitely a no go"). KENYHERCZ explains that SANTUCCI is away in New York City for the weekend ("he's away until Monday . . . in New York City"). KENYHERCZ complains that SANTUCCI said he could consummate the controlled substance sale at 3:00, but BERTANZA did not call him so KENYHERCZ cancelled and changed it to 8:00 p.m., but KENYHERCZ did not hear from BERTANZA again. Finally when BERTANZA notified Kenyherz at 10:00 p.m., SANTUCCI related that he was "gone until Monday." After BERTANZA complains, KENYHERCZ assures him that the controlled substances will be available on Monday ("you can have it Monday").

104.   On March 9, 2015, in KENYHERCZ Session 837, BERTANZA, utilizing the BERTANZA Telephone, calls KENYHERCZ, who is utilizing the KENYHERCZ Telephone, and engages in the following conversation:

KENYHERCZ:   Hello.

BERTANZA:   What do you mean it's all set? Like you could have it today?

KENYHERCZ:   It's all set, what's that?

BERTANZA:   Like you could have it today?

KENYHERCZ:   No, no, I'm leaving, I'm leaving for Tennessee today, it's all set as in Saturday as soon as they get back it's I can meet em anytime I want

BERTANZA:   Alright

KENYHERCZ:   He's got, he's got, what's that.

BERTANZA:   100%, I'll, I'll do my part, I'll get everything together.

KENYHERCZ:   Alright, I'll get ya, I'll get ya a total and everything else and then you know you know and make it happen for Saturday.

BERTANZA:   We already know the total we've done it, this is the third time we've done it it's the same total every time, no?

KENYHERCZ:     I, I didn't hear what you said

BERTANZA:      I said this is the third time we've done it, we already know what the total is

KENYHERCZ:     No, not the total probably of bottles they have the total on the price.

BERTANZA:      I know but this is the third time we've done it so I mean how can it not be the same price?

KENYHERCZ:     Well because like I said last time it was it was on average only there was only 35 or whatever and the last time 36.

BERTANZA:      And I know 36 it was 37 and I fuckin gave you $1.75 or whatever you know I'm saying I gave you half like the half of my profit.

KENYHERCZ:     No last time, last time I barely made dick, I had to give you 4, 3 bottles for the fuck up I didn't get 44 last time plus I got to factor in the price of the Cialis.

BERTANZA:      I understand that so alls you gotta do just add the price of (UI) that's all.

KENYHERCZ:     Yeah, so it's 45.

BERTANZA:      I already know what i is, it's a little under $2,000 grand I I know how much it cost.

KENYHERCZ:     No, because no like I said last time I didn't take any cuts 40 dollars a bottle, 50 bottles, it's $2,000   grand plus Cialis.

BERTANZA:      Alright so I don't understand so there you go that's $40 grand $40 a bottle that's your cut, that's everything.

KENYHERCZ:     Yeah, so that's Cialis like whatever it is, 175.

BERTANZA:      See how simple that was, see how easy that was, it's like amazing, sounds like a plan.

KENYHERCZ:     Alright.

BERTANZA:      See, alright, so.

KENYHERCZ:     Alright you got it.

BERTANZA:      Alright.

KENYHERCZ:     Alright.

BERTANZA:      Later.

KENYHERCZ:        Later

105.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, I believe that during this conversation, BERTANZA asks KENYHERCZ if they are ready to complete the transaction, but KENYHERCZ relates that he is leaving for Tennessee and the deal is "all set" for Saturday. KENYHERCZ tells BERTANZA that he will provide BERTANZA with a total price ("a total") and that BERTANZA should arrange for the transaction to occur on Saturday. BERTANZA notes that this is "the third time" and it is the "same total every time." KENYHERCZ points out that the last time, they had to pay SANTUCCI $35 or $36 per bottle of liquid steroid ("there was only 35 or whatever and the last time 36"). BERTANZA responds that it was more like $36 or $37 per bottle ("I know 36 it was 37"), and that he gave KENYHERCZ half of his markup ("I gave you half like the half of my profit"). KENYHERCZ replies that the "last time" he did not make much profit ("I barely made dick") when they charged CW-1 "40 dollars a bottle and he did not factor in the cost of "the Cialis." KENYHERCZ added that the total price of the steroids was $2,000 ("it's $2,000) "plus" the price of Cialis, which was $175 ("$1.75"). KENYHERCZ and BERTANZA then agree that they will charge CW-1 $40 per bottle. The order, referenced above, that BERTANZA placed for CW-1 was for both steroids and Cialis.

### 5.    **KENYHERCZ and PECORA**

106.    On March 17, 2015, in KENYHERCZ Session 4981, KENYHERCZ, utilizing the KENYHERCZ Telephone, calls Frank PECORA, who is utilizing phone number (203) 584-6305, and the two engage in the following conversation:

aPECORA:          Hello.

KENYHERCZ:       Hey what's happening?

PECORA:          Nothing, What's up?

KENYHERCZ:       Ah can you see my cousin at 9 o'clock? I told him he needed to buy 10 to make it worth your while so he can grab 10 of the 8's.

PECORA:          Alright um, ok hold on. Let me get a clear head.  What time is it?

KENYHERCZ:       It's uh, quarter after eight.

PECORA:          Tell him to call me 15 minutes before he comes. Come up here go through the hallway and go to Jason's house.

PECORA:          Alright. I mean, he's gotta give me, tell him to fuckin call me 15 minutes later so I have time to get ready for him to come, you know?

KENYHERCZ:       Alright. No problem. I'll tell him to call you at 8:45.

PECORA:          Alright, bye.

KENYHERCZ:       Alright, thanks bye

107.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, I believe that KENYHERCZ informed PECORA that he (KENYHERCZ) had told his cousin that if he wanted to purchase 80 milligram oxycodone pills ("8's") from PECORA, he had to purchase at least ten pills ("he needed to buy to make it worth your while").  PECORA agreed to sell the oxycodone to Kenyercz's cousin and gave instructions on where to meet him ("Tell him to call me 15 minutes before he comes. Come up here go through the hallway and go to Jason's house").

108.    On April 10, 2015, in KENYHERCZ Session 14474, Frank PECORA, utilizing (203) 594-6305, telephoned KENYHERCZ on the KENYHERCZ Telephone, and engaged in the following conversation:

KENYHERCZ:       Hello.

PECORA:         What's going on?

KENYHERCZ:      What's happening?

PECORA:         Anybody want any of these oranges?

KENYHERCZ:      I can make a couple calls.

PECORA:         Yeah, I want, I usually sell them fifty each, I need to sell them cause I'm leaving on Thursday and then you guys are going to have nothing, so if I were you I'll tell them to get .. buy as much as they can by Tuesday or Wednesday cause I'm not going to let anybody do anything with stupid.

KENYHERCZ:      Yeah, no I don't blame you. I don't blame you.  Alright, you're gonna believing what, Tuesday you said?

PECORA:         No, Thursday I'm leaving, so I want to get rid of them by Tuesday or Wednesday cause I have shit I gotta do.

KENYHERCZ:      Alright.  I'll make some UI.

PECORA :        I gotta go buy some shoes tomorrow and I gotta get some light clothes when I go buy some   new clothes, so ...

KENYHERCZ:      Alright, yeah I'll make a couple calls and I'll get right back to you.

PECORA:         Alright, bye.

109.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, I believe that PECORA asks KENYHERCZ if any of his customers want Opana pills ("oranges") that PECORA has for sale.  PECORA notes that he usually sells one Opana pill for $50 ("I usually sell them fifty each") and that he is leaving on Thursday for a period of time so KENYHERCZ's customers will not have a source of Opana supply ("I'm leaving on Thursday and they you guys are going to have nothing, so if I were you, I'll tell them to get . . . buy as much as they can by Tuesday or Wednesday").  KENYHERCZ agrees to contact his customers ("yeah, I'll make a couple calls").

### 6.      **KENYHERCZ and GENTILE**

110.   On March 26, 2015, in KENYHERCZ Session 10181, GENTILE, who was utilizing phone number (203) 836-7126 telephoned KENYHERCZ, who was utilizing the KENYHERCZ Telephone, and engaged in the following conversation:

KENYHERCZ:   Hello?

GENTILE:   What's up big guy?

KENYHERCZ:   What's up dude?

GENTILE:   Hey nuttin' dude, fucking, yeah yeah real quick about that order, right? I-it's kinda, it's kinda a heavy order you know what I mean and um, my thing is though (KENYHERCZ interrupts).

KENYHERCZ:   He knocked, he knocked it down to eleven eighty.

GENTILE:   Eleven eighty?

KENYHERCZ:   Yeah, from thirteen-whatever to eleven eighty.

GENTILE:   Alright and then yo would you, and now if I, but and I know I'm not pushing this shit on you bro like I came across about like 30 tabs of like, I, I, I, nevermind, I, I don't want to put them in your hand, you know what I mean cause I know what you're going through or went through.

KENYHERCZ:   Wh-wh-what is it I'll tell you if I can handle it or not?

GENTILE:   Well it's like uh percs and vicodin.

KENYHERCZ:   How many of them are there?

GENTILE:   What?

KENYHERCZ:    (UI) milligrams.

GENTILE:   I can get the milligrams for you, um, I forgot exactly what they were, I, but I remember, um, why (UI), what, what's the milligrams they come in again?

KENYHERCZ:   Um they come in 5, 10's, if they're percocets they come in 5, 10's, 15s, 30's if they're vicodin (GENTILE interrupts).

GENTILE:   I think they might be, um I think they might be like 10's.

KENYHERCZ: Alright, well because here's the thing if I know in advance that you have them I could just make a couple calls and then I don't have to hold on to them for very long, you know what I mean?

GENTILE: Yup. Alright, I'm gonna, I'll, I'll, what I'll do is I'll fuckin', I'll talk to the individual today actually cause he's coming over right now and I'll see if I can get them, and I'm not doing it cause I know how you feel about it, you know what I mean and like, I'm just saying and then um, what's call it, do you want the Adderalls too?

KENYHERCZ: Yeah, well you know what it is too bro, the, the guy that I get them from sometimes he has a friend that asks him so I might be able to just give him and get rid of them in one whack, you know what I mean so that way I don't even have to, don't even have to have them on hand.

GENTILE: Ok. Alright and then so you said he knocked it down to eleven eighty?

KENYHERCZ: Yeah, he knocked it down cause it was what, originally, I have to, I have to look at the invoice but he knocked, he knocked 150 off and, I forgot what, whatever it was, you sent me the numbers, I just have to re-calculate it but he knocked it another 150 bucks off so I think he can't do eleven eighty but I, I'll re-calculate it.

GENTILE: Yo, do you think I didn't, do you think one bottle of the, the Winstrol, do you think the one bottle or the two bottles are fine? I ordered three, you think I can get away with two for a cycle of Winstrol?

KENYHERCZ: Well I mean you're gonna take, how long are you running it for?

GENTILE: Out of all of them I do like seven, what seven, eight weeks (UI), where, where would one bottle get you what like five, six weeks right?

KENYHERCZ: Yeah, well how many you take in a day?

GENTILE: Three.

KENYHERCZ: Yeah, if you're doing three, three a day you want to go with the three bottles because if you go, if you go, three a day then it's gonna last you, it's gonna last you about four, five weeks, six weeks, six weeks. No, twenty (GENTILE interrupts).

GENTILE: Alright, yeah cause what I do is I go like three and I taper off on I'm down to like one, well two then one just because it's like, that's just like heavy on you, you know what I mean?

65

KENYHERCZ:     Yeah. Well, like I said, I mean with him knocking, with him knocking the 150 bucks off, you know what I mean, so he's almost getting a free bottle anyway so you know what I mean?

GENTILE:       Yup.

KENYHERCZ:     So you might as well just take the, take the third you know what I mean, unless, unless, you really need the extra cash then, like I said (GENTILE interrupts).

GENTILE:       How long, how long are you home for?

KENYHERCZ:     Um, I'm gonna be home the rest of this week and all of next and then I'm going to Massachusetts for a weekend and then we're just waiting for a call to go back down to Tennessee.

GENTILE:       Alright, because I get paid Thursday. I, I need, are you gonna be home by next Thursday?

KENYHERCZ:     Yeah, I'll be, I'll be home next Thursday but I'm leaving, I'm leaving next Friday.

GENTILE:       Alright. Alright cause I, I mean, I guess I'll just pull the money from somewhere dude freaking um, when you putting this order in?

KENYHERCZ:     Uh, well I, I purchased the order today, he said he could have it as soon as tomorrow.

GENTILE:       Ok, I'd have to hit the bank up then.

KENYHERCZ:     Yeah, like I said he could have it tomorrow. The only thing that he's waiting on, the, the order's already pretty much ready, the only thing he's waiting on is the uh, the, the tren acetate for the blend, so.

GENTILE:       Tren acetate for what?

KENYHERCZ:     He's got the, uh, the tren enanthate but he doesn't have the acetate to make the blend. He has the enanthate to make uh, you know, like a regular two milligram but he doesn't have the fast acting to make the blend yet so that's the only thing he's waiting on.

GENTILE:       Ok. And then um, you're not moving down there though are you?

KENYHERCZ:     Um, not, not this soon but it's a possibility but that'd be like, you know, at least three months out, two, three months out.

GENTILE:        Yeah. You know what, maybe I'll knock off the fucking one bottle of the Winstrol then I'll just get that at a later time. Matter of fact, yeah, before you, before you put, can you, can you do that? Can you knock one off? And the reason why, and then, and then uh, I'll just grab it at a later time and then, cause that's like an extra 175 bucks. And you're still throwing in that Clomid right?

KENYHERCZ:      Yeah, yeah, the Clomid's on me.

GENTILE:        Alright, and then uh, I'm gonna go get a prescrip- yeah so it'll be two instead so, do you think he'll still knock the 150 off on top of that shit?

KENYHERCZ:      Yeah, well like I said dude whatever, whatever this guy gives me, I'm giving you anyway so even if you know, like I said even if he, let's say he knocks a buck twenty five off or whatever, you know what I mean I'll still give it to you anyway so.

GENTILE:        Great. Alright let me know, uh, when, what the total with that's gonna come out to be and then I'll fuckin' uh, I'm gonna work out, I'll ask about these pain killers right now and then I'll ask about, and I'll set up an appointment too to go get the fuckin' tabs of uh, Adderalls.

KENYHERCZ:      Alright.

GENTILE:        Alright (talking over each other).

KENYHERCZ:      Let me know cause like I said he, he could have it as soon as tomorrow so just let me know what day will work best for you and then I'll, I'll set up a delivery date for this.

GENTILE:        Excellent, thanks man.

KENYHERCZ:      Alright bro you got it.

GENTILE:        Later

111.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, I believe that in this conversation, GENTILE discusses a large order ("heavy order") for steroids ("Tren acetate," "tren enanthate," Winstrol") and "Clomid," an "off cycle" drug to counteract the elevated level of estrogen produced by

steroids, he has placed with KENYHERCZ, and KENYHERCZ describes the price as having been marked down from $1,300 some-odd dollars ("thirteen whatever") to $1,180 ("eleven eighty"). KENYHERCZ notes that SANTUCCI is reducing the price of the order by $150 ("with him knocking the 150 bucks off"). GENTILE promises to come up with the money for the order ("I'll just pull the money from somewhere dude") and asks when KENYHERCZ is placing his order ("when you putting this order in?"). KENYHERCZ replies that he purchased the steroids "today" and that SANTUCCI ("he") would have the order ready the next day ("tomorrow"), noting that SANTUCCI was waiting for the "tren acetate for the blend." GENTILE goes on to discuss ordering oxycodone ("pain killers") and Adderall from KENYHERCZ. GENTILE and KENYHERCZ discuss GENTILE supplying KENYHERCZ with pills, specifically Percocet and Vicodin. ("…I'm not pushing this shit on you bro like I came across about like 30 tabs of like…" and "Well it's like uh percs and Vicodin"). GENTILE states that he can not remember a specific type of pill that he can obtain for KENYHERCZ ("I can get the milligrams for you, um, I forgot exactly what they were, I, but I remember, um, why (UI), what, what's the milligrams they come in again?") and KENYHERCZ explains the specific milligrams that various pills are manufactured in ("Um they come in 5, 10's, if they're percocets they come in 5, 10's, 15s, 30's if they're vicodin").

112.    On March 28, 2015, in KENYHERCZ Sessions 10996, 11014, 11019 and 11029, GENTILE, who was utilizing phone number (203) 836-7126 telephoned KENYHERCZ, who was utilizing the KENYHERCZ Telephone, and engaged in the following conversation:

GENTILE:          Meet me I got the cash (Text Message Session 10996)

                              *    *    *

KENYHERCZ:     I can be there by 2 I just took the plow off the truck I just have to bring the
                      truck back then I can leave. (Text Message Session 11014)

*   *   *

Sessions 11019

KENYHERCZ:          I'm actually leaving Stratford now I can be there in a half hour.

GENTILE:            Alright, I'm at my house waiting for you, man.

*   *   *

KENYHERCZ:          Im here back door (Text Message Session11029)

113.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in these conversations, that KENYHERCZ and GENTILE were meeting one another in furtherance of completing a drug transaction.

114.    On March 28, 2015, surveillance was established in the area of GENTILE's residence located at 3 Hughes Circle, Ansonia, Connecticut. At approximately 1:29 p.m. surveillance observed KENYHERCZ traveling from the area of GENTILE's residence. Surveillance then observed KENHERCZ park the work vehicle that he was traveling in and enter his 2003 Chevrolet S-10 pickup truck. Based on the above referenced telephone conversations and surveillance, I believe that KENYHERCZ met with GENTILE in furtherance of completing a drug transaction.

115.    On April 26, 2015, in KENYHERCZ Sessions 18051 and 18194, GENTILE, who was utilizing phone number (203) 836-7126 telephoned KENYHERCZ, who was utilizing the KENYHERCZ Telephone, and engaged in the following conversation:

aKENYHERCZ:        Yeah, you gave, you gave me quite, you gave me quite a bit. The, the, the reason that I am out a little bit is because the guy, the guy Steve, he took a couple, he took a couple in trade because he was getting ready for a fuckin Lt or Sgt test or something and he needed a little extra boost so. But if you don't have any to spare you don't have any to spare.

69

GENTILE:     I think I might have to wait until I get my next 2 scripts just because I remember I can't use all 14 of them or 15.  Matter of fact I gave you 20 of them so I am already 5 in the hole.  And like its kinda like I think I have to go like 5 days before I whatchamacallit.

\*   \*   \*

GENTILE:     You said you only have that 1 bottle of test right?

KENYHERCZ:   I might. Did you want 2? I know I owe you 1 on the cuff for free. I am trying to get out of this hole before I give it to you because I am sitting on 300 Cialis that I paid $1 a piece for.

GENTILE:     Well I am trying to get rid of those for you tomorrow. I am trying to figure it out because I know that girl is asking for them.  I will see how many she will take you know what I mean.  I don't know if she is still with that dude that had a fuckin dick problem.  But uh yeah frickin if you could I would appreciate it.  I am going to give you $50 right now for this shit.

KENYHERCZ:   Yeah.

\*   \*   \*

GENTILE:     Like that shit ain't good.  Yo, I felt, like yo, I'm done.  But then I got so mad, yo, I was like on a deathwish with dude yo.  Like I've never felt that way before.  I was like yo I grabbed my shotgun, I went down to Bridgeport, I was like I'm gonna die tonight yo, I'm gonna kill this dude.

KENYHERCZ:   Yeah.

GENTILE:     You know, and I mean, that's not good either.

KENYHERCZ:   Yeah.

GENTILE:     Like, it seemed like I had more control over the Tren.

KENYHERCZ:   Yeah, well like I said, it's not something, yeah, yeah, it could be part of the Test, but you know what it   is, it's your estrogen levels, because what happens is when you take a shot you feel 3-4 days and it's after that, what's happening is your levels are getting so high after 3,4, 5, 6 weeks that your body is producing more estrogen to balance out your testosterone levels. So you got get something to get that  under control. So, when I see you tonight, we're square away and I'll pick you up some fucking estrogen blockers.

GENTILE:     I appreciate it brother.

\*   \*   \*

GENTILE:            Yep, hey where you at?

KENYHERCZ:          Um, I'm just getting ready to leave my house.

GENTILE:            Alright, cool.

KENYHERCZ:          Alright?

GENTILE:            Alright I'll see you at the house then.

116.   Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, that GENTILE explained to KENYHERCZ that he was experiencing side effects from the steroids he had been using. Specifically GENTILE told KENYHERCZ that he wanted to kill a man ("Like that shit ain't good.  Yo, I felt, like yo, I'm done.  But then I got so mad, yo, I was like on a death wish with dude yo.  Like I've never felt that way before.  I was like yo I grabbed my shotgun, I went down to Bridgeport, I was like I'm gonna die tonight yo, I'm gonna kill this dude.").  GENTILE further explained that he believed he had control over his emotions when he was using Trenbolone ("Like, it seemed like I had more control over the Tren.").   KENYHERCZ confirmed that part of GENTILE's volatility could be due to the Testosterone he used ("it could be part of the Test").   KENYHERCZ suggested that GENTILE could use estrogen blockers to balance GENTILE's levels of Testosterone.  KENYHERCZ and GENTILE confirmed that they would meet at GENTILE's house later that same night ("Alright I'll see you at the house then.").  Based on my training and experience, I believe that extended use of steroids can lead to episodes and fits of uncontrollable anger and that GENTILE was relating that he was driving around Bridgeport with a shotgun while experiencing such an episode.

117.   Based on my training and experience, the training and experience of other special

agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, that GENTILE and KENYHERCZ discuss the purchase and sale of various controlled and non controlled substances, to include: prescription pills, steroids and Cialis. KENYHERCZ states to GENTILE that KENHERCZ provided prescription pills, identified during the course of the investigation as Adderall, to SANTUCCI in trade ("the reason that I am out a little bit is because the guy, the guy Steve, he took a couple, he took a couple in trade"). KENYHERCZ discusses GENTILE's willingness to provide his pills to KENYHERCZ ("But if you don't have any to spare…"). GENTILE then states that he will have to wait a period of time to refill his prescription ("I think I might have to wait until I get my next 2 scripts).

118.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation, GENTILE asks KENYHERCZ to confirm that KENYHERCZ has a quantity of Testosterone ("You said you only have that 1 bottle of test right?". KENHERCZ then asks if GENTILE wanted two bottles of Testosterone, and states that he owes GENTILE one bottle of Testosterone ("I might. Did you want 2? I know I owe you 1 on the cuff for free").

119.    On April 26, 2015, investigators established surveillance in the area of GENTILE's residence located at 3 Hughes Circle, Ansonia, Connecticut. At approximately 10:35 p.m., surveillance observed GENTILE's vehicle, Nissan Frontier, color black, arrived at GENTILE's residence. At approximately 10:47 p.m., surveillance observed KENYHERCZ's vehicle, a 2003 Chevrolet S-10 pickup truck, arrive at GENTILE's residence. Surveillance observed that KENYHERCZ's 2003 Chevrolet S-10 pickup truck remained at GENTILE's

residence until approximately 11:11 p.m.

### 7.   **KENYHERCZ and DH**

120.   On March 5, 2015, in KENYHERCZ Session 4, KENYHERCZ, utilizing the KENYHERCZ Telephone, calls DH, who was utilizing (203) XXX-6969 and engaged in the following conversation:

DH6969:   Hello

KENYHERCZ:   Hey what's happening?

DH6969:   What's up?

KENYHERCZ:   Hey you know what I forgot to tell you I talked to Steve. He's got the um, the Cialis and he has the Viagra powder in so, he does, he does 50 milligram Viagras the 20 milligram, Cialis like we always get, or   he does what he calls the cock bomb which is (laughing) which is 25 milligrams of each.

DH6969:   Whatever, whatever, I mean, what does, what does he recommend?

KENYHERCZ:   Well like I said, I mean, the, the regular Cialis that we always get, I mean they are cheap, they are two bucks and they seem to always work.

DH6969:   Yeah I mean, I would just go with that because those work, those seem to work, I told you those work better then the, then the Viagra I was getting, that I get at, a prescription you know?

KENYHERCZ:   Yeah. Yeah, maybe what I'll do is I'll put, I'll put together a little order for like a, some of the regular Cialis and I'll have 'em do a mix of the combo. See what those are like too.

DH6969:   Yeah I mean I guess either way what-you know ask him what he recommends you know?

KENYHERCZ:   Right and how many you think you wanted?

DH6969:   I dont know, maybe fifty.

KENYHERCZ:   All right, no problem (voices overlap- UI)

DH6969:   What are they, what are they like, what are they charging up the hill?

KENYHERCZ:   Two bucks.

DH6969:          Yeah that's better than fucking fifty.

KENYHERCZ:      Ah yeah I mean they, you're going to get fifty for the same price you're going to pay for one.

DH6969:          My god.

KENYHERCZ:      You know?

DH6969:          I'm surprised that he doesn't charge more though.

KENYHERCZ:      No well, I mean, you know what it is, he gives them to me for two so he's like you know you should charge people like four or five.

DH6969:          Yeah, yeah. That's what I figured.

KENYHERCZ:      I'm not going to charge, I'm not going to charge you five bucks for a fucking pill.

DH6969:          No, no, I didn't, I didn't know what the market was, (UI) you know?

KENYHERCZ:      I have this old Spanish guy that pays me five dollars a piece for 'em all day long.

DH6969:          Oh yeah, I would, I, I, I could see why, you know?

KENYHERCZ:      Yeah, so but you're right though I, I, I, I like 'em better than the fucking, any of the pharmaceutical

DH6969:          Yeah

KENYHERCZ:      Because I know a guy who gets the hundred milligram Viagra the big blue ones

DH6969:          Yeah

KENYHERCZ:      And they do nothing but give me a fucking headache. You know (laughing)

DH6969:          You know. Have you been down there yet?

KENYHERCZ:      I'm headed down there right now, (UI) heading down to Norwalk.

DH6969:          (UI)    I just picked up Gregory so.

KENYHERCZ:      All right.

DH6969:                    Let me know how bad it is you know?

KENYHERCZ:           All right sounds good. I'll give you a ring in a few, all right bye

121.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that during this telephone conversation, KENYHERCZ informs DH that he has spoken to SANTUCCI ("Steve") and SANTUCCI has Cialis and Viagra powder[3] and can offer a mixture of the two called a "cock bomb," which is 25 milligrams of each. I know that because the Cialis and Viagra powder they are discussing selling is counterfeit, their conduct in selling the patented prescription medications is illegal under federal law. KENYHERCZ adds that each Cialis costs $2.00 ("two bucks") and they "always work." DH relates that his buyer would like to purchase "maybe fifty" pills and KENYHERCZ responds that there should be "no problem." DH expresses his surprise that SANTUCCI does not "charge more" and KENYHERCZ notes that he has a customer that "pays me five dollars a piece."

## 8.     **KENYHERCZ and KC**

122.    On March 8, 2015, in KENYHERCZ Session 531, KC, utilizing phone number (203) XXX-9948 telephones KENYHERCZ, who was utilizing the KENYHERCZ Telephone and engaged in the following conversation:

KENYHERCZ :          Hello

KC9948:                    What's up man? I tried calling you a little while ago but your phone was dead or something.

KENYHERCZ:           Yeah, yeah, it was dead.

KC9948:                    What' s going on?

---

[3] Cialis and Viagra are both non-controlled substances that are taken in a pill form and are used to treat erectile dysfunction. Cialis has been patented by its manufacturer Eli Lilly in the United States until 2017. Viagra has been patented by its manufacturer Pfizer, Inc. until 2020.

KENYHERCZ:     Ah, not much what are you up to?

KC9948:     Ah, not much man, I'm guessing Frank doesn't have any uh greens still?

KENYHERCZ:     No, not yet.

KC9948:     But but he has those oranges though?

KENYHERCZ:     Yeah.

KC9948:     What's that?

KENYHERCZ:     Yeah, he still has oranges.

KC9948:     Umm, what's the minimum amount I have to get?  Like what three or four something.

KENYHERCZ:     Yeah, something like that, usually three.

KC9948:     Ahh, alright I guess I'll do that.  Uh, what are you up to, are you at home right now?

KENYHERCZ:     Yeah, yeah, I'm home.

KC9948:     Alright, ahh, do you want to give a call and see if he's home and I'll swing over on the way, or

KENYHERCZ:     Yeah, how many do you want?

KC9948:     Um, probably three or four, I'm not a 100 percent sure yet

KENYHERCZ:     Alright.

KC9948:     Alright.

KENYHERCZ:     Alright.

KC9948:     Alright

123.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that during this conversation, KC asks KENYHERCZ whether PECORA ("Frank"), who is KENYHERCZ's employer and one source of supply for controlled substances,

has any 15 milligram oxycodone pills ("greens") available.   KC then confirms that PECORA

("Frank") has Opana pills ("oranges") available, to which KENYHERCZ replies that he does

("Yeah, he still has oranges").   KC asks what the minimum amount of pills he has to purchase

and KENYHERCZ confirms that it is "usually three."

### 9.   **KENYHERCZ and ET**

124.   On March 27, 2015, beginning in KENYHERCZ Session 10444, ET, using

telephone number (203) XXX-1867 and KENYHERCZ, using the KENYHERCZ Telephone,

engaged in the following text message exchange:

| | |
|---|---|
| ET1867: | Yo (10444) |
| ET1867: | U get any extra percs (10445) |
| ET1867: | Extra? Bahaha (10447) |
| KENYHERCZ: | Lol how many would you want.  My buddy has some (10448) |
| ET1867: | 3 (10449) |
| ET1867: | Also I need a bottel of clomid ans noledex (10450) |
| ET1867: | Plus the bottle of test and  anavar (10451) |
| ET1867: | So thats:<br>Calicus<br>Noledex<br>Clomid<br>Test<br>Anavar<br>If u can get bio water need some of that to (10452) |
| ET1867: | Found my blues (10459) |
| KENHERCZ: | Are u asking or did you find some because ill take a couple (10461) |
| ET1867: | I found them . 5hey are 30. But I'm going to get them in a min. I'll grab u some if u want (10464) |
| KENYHERCZ: | 30 thats steep lol ill take 3 (10465) |

ET1867:        I know but it close and convent.  Glad u are back..lol (10466)

ET1867:        I'll grab them when I'm done then 8ll call and met u (10467)

ET1867:        Please make sure u pit that shit in the order for me.  I get payed mon as
               well (10468)

KENYHERCZ:     Ok Ill send it to him right now (10469)

ET1867:        Thx (10470)

                              *    *    *

ET1867:        I was ten shy one time with u. But if I go back for this other one I really
               need 30. Ok?  I'm def not charging u 5 extra after all the times u plugged
               me (10540)

ET1867:         in believe that (10541)

KENYHERCZ:     Bro I know your not like that.  I never even questioned it.  We help each
               other out I know sometimes shit comes up with work or with steve but
               whenever I could hook you up I try too.  Im into raping other people for
               money lol not my friends that look out for me too (10543, 10544)

ET1867:        I hear ya (10549)

KENYHERCZ:     Like mark lol mr. What have you done for me lately. Im gonna rape his
               ass for those Cialis then throw you some cash (10550)

ET1867:        Awesome.  Seen him today at the deli.  Told him it's my old ladys birthday
               could use some money and bo response (10553)

KENYHERCZ:     He is a dirty nigger loving cock sucker. When he has like 4 or 5k he is
               king shit big ding a ling daddy now he is crying poor mouth.  He spent all
               his money on the percs he doesnt do (10557, 10558)

ET1867:        Sound about right (10561)

KENYHERCZ:     He fucking irritates me. We are fucking him good though. Its his 50 bottle
               order that got your stuff cheaper. Im going to bang him up for $25 per
               bottle and 2.25 on the Cialis. Ill leave a little wiggle room. Anything I
               make over a thousand you can have it will probably be about 300 bucks
               that way is he owes you is taken care of. Any deal that I screwed up on
               patched up and you have some money for your old lady's birthday (10563,
               10564, 10565)

KENYHERCZ:      Cool? (10566)

ET1867:         Ansolutly (10570)

KENYHERCZ:      Because I  know Mark was buying things off of you but with the 50 bottle
                order it might cost a little cheaper from Steve it helps him make the deal
                but I don't want to step on your toes so that's my way of making things
                right (10572, 10573)

ET1867:         I didn't step on your toes when u where gone either.  That way it works.
                Just clip his ass (10575)

KENYHERCZ:      Hey if you want to wait until 5 I can get blue at 25 (10615)

ET1867:         K (10617)

KENYHERCZ:      Do u want any addiws (10625)

ET1867:         No (10626)

ET1867:         I'm all set (10627)

KENYHERCZ:      Im just waiting for a text how many do u want? (10655)

ET1867:         Actually  I'm set for now.  I got the ones I was raped on earlier.  I have to
                take the old lady out to eat still (10659)

125.    Based on my training and experience, the training and experience of other special
agents involved in this investigation, and information I have learned during the course of this
investigation, I believe that in this text message exchange, ET asks KENYHERCZ if he has
Percocet for sale ("U get any extra percs"). KENYHERCZ asks how many Percocet pills ET
wants and states that he knows someone who has Percocet for sale ("Lol how many would you
want. My buddy has some"). ET states that he wants three pills ("3"). ET then places an order
for various steroids with KENYHERCZ ("clomid" "noledex" "test" "anavar").  ET reminds
KENYHERCZ to place his order with SANTUCCI, noting that he gets paid on March 30, 2015
("Please make sure u pit that shit in the order for me.  I get payed mon as well").  KENYHERCZ

promises to send the order "to him right now." KENYHERCZ and ET discuss how they calculate lower prices for drugs when selling to one another versus selling drugs to other people. KENYHERCZ states, "Im into raping other people for money lol not my friends that look out for me too". KENYHERCZ and ET discuss their frustration with BERTANZA and how BERTANZA charges KENYHERCZ and ET. KENYHERCZ states that he will raise the price of Cialis that he sells to BERTANZA stating that he will "rape" BERTANZA ("Like mark lol mr. What have you done for me lately. Im gonna rape his ass for those Cialis then throw you some cash"). KENYHERCZ then tells ET that Mark BERTANZA's purchase of steroids and Cialis, which is the order CW-1 placed at the DEA's direction, will allow him to obtain a cheaper price for the steroids for ET ("Its his 50 bottle order that got your stuff cheaper. Im going to bang him up for $25 per bottle and 2.25 on the Cialis") from SANTUCCI ("the 50 bottle order it might cost a little cheaper from Steve"). KENYHERCZ and ET discuss the drug order, and potential profit, that KENYHERCZ could make from the sale of drugs to BERTANZA's customer (CW-1). Based on my training and experience, when ET instructs KENYHERCZ to "Just clip his ass", I believe ET is instructing KENYHERCZ to lie to BERTANZA regarding the cost of the drugs. By falsely inflating the cost of the drugs to BERTANZA, KENYHERCZ will make increased profits that he will utilize to ET's benefit.

### 9.   **KENYHERCZ and DA**

126.   On April 15, 2015, in KENYHERCZ Session 15623, DA, who was utilizing phone number (475) XXX-0276, telephoned KENYHERCZ, who was using the KENYHERCZ Telephone and engaged in the a conversation, the following portion of which was pertinent:

DA9276:            Subs and let me know. Like I said, I need the two Cyp and I need the two Dec.

KENYHERCZ:      Yep.

DA9276:            Well actually I might need three Cyp but whatever. Whatever you got.
                   You know what I mean. As long as its one Cyp and two Dec, I don't care
                   what the rest of it is.

KENYHERCZ:         Yeah.

DA9276:            As long as its not fucking, what is it, it needs to be test that's all.

KENYHERCZ:         Yeah.

DA9276:            Like that shit you gave me last time, the clomid and shit.

KENYHERCZ:         Yeah.

DA9276:            That shit was good. Whatever. I know that, you're always good to me dude
                   so I'm not worried about it.

KENYHERCZ:         Yeah, no.

    127.    Based on my training and experience, the training and experience of other special

agents involved in this investigation, and information I have learned during the course of this

investigation, I believe that during this conversation, that DA orders steroids ("one Cyp and two

Dec, I don't care what the rest is"; "it needs to be test tha's all") from KENYHERCZ and refers

to a previous order for steroids he placed ("Like that shit you gave me last time, the clomid and

shit").

    128.    On April 16, 2015, beginning in KENYHERCZ Session 15975, DA, utilizing

phone number (475) XXX-0276 and KENYHERCZ, who was utilizing the KENYHERCZ

Telephone, engaged in the following text message conversation:

DA9276:            U got liquid dick shit? (15975)

KENYHERCZ:         No just the tablets (15976)

DA9276:            Vs and cialis? (15977)

DA9276:            I need cialis stat..so it kicks in tonight bra (15979)

DA9276:        I know ur mad busy.. but Kim n I are gonna make dinner.. do our thing n try to go to sleep early so I can get up n bring her D.S.S. tmrw..hit me up (15982)

DA9276:        R u stopping by (15997)

KENYHERCZ:     I can bring you some cialis. Ill have the bottles tomorrow ill show u the text from Steve. Fuck Dave I saw a lawyer today (15998)

DA9276:        I do have cash (15999)

                            *   *   *

KENYHERCZ:     Do u want me to swing by (16003)

DA9276:        Perfect timing on bottles tx bro..if u thing ur gonna b late I can c u tmrw. Just let a cracka know..or I can meet u (16004)

DA9276:        I'll meet u wherever cuz my son us sleep in (16005)

KENYHERCZ:     If you want I can come to you.  You can come.chill in the car (16006)

DA9276:        My dway is hot.. how bout henny?or cvs (16007)

KENYHERCZ:     Cvs is cool bring choco and adds (16008)

DA9276:        Always (16009)

KENYHERCZ:     When will you be there (16011)

DA9276:        Passin carwash (16012)

KENYHERCZ:     Sweet nigger (16014)

DA9276:        Wur u at nigga"f.I.voice (16015)

KENYHERCZ:     Coming down hill

129.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that DA asks for liquid cialis ("U got liquid dick shit?) to use that evening ("I need cialis stat..so it kicks in tonight"). KENYHERCZ agrees to bring DA Cialis ("I can

bring you some cialis") and then informs him that he is picking up steroids the next day from SANTUCCI ("Ill have the bottles tomorrow ill show u the text from Steve").  DA agrees to purchase the steroids with "cash."

### 10.   KENYHERCZ and NB

130.    On April 20, 2015, in KENYHERCZ Session 16581, NB, who was utilizing phone number (203) XXX-0795, telephoned KENYHERCZ, who was using the KENYHERCZ Telephone and engaged in the a conversation, the following portion of which was pertinent:

NB0795:             Um, so what was up with the license thing like I vaguely remembered you telling me you needed my license for something?

KENYHERCZ:     Yeah you know what it was is I I just needed a fucking with my license I let a my guy Steve use it to send Western Union money over to a over to China.

NB0795:             Yep.

131.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this conversation KENYHERCZ stated that he provided his driver's license to SANTUCCI so that SANTUCCI could use KENYHERCZ's license when providing identification to Western Union. During the course of this investigation, through the issuance of an administrative subpoena to Western Union, investigators know that SANTUCCI purchased in excess of one hundred thousand dollars worth of Western Union Money orders. These Western Union records indicate that in November 2013, SANTUCCI stopped using his identification to purchase money orders. Investigators believe that SANTUCCI has utilized KENYHERCZ's license to purchase money orders since November 2013.

### 11.   SANTUCCI  and MASE WhatsApp Communications

132.    On April 21, 2015 and April 22, 2015, MASE utilizing (203) 241-7173 and

SANTUCCI utilizing the SANTUCCI Telephone, exchanged a series of WhatsApp message communications in furtherance of a drug transaction:

April 21, 2015:

| | |
|---|---|
| SANTUCCI: | I'll be in newtown if your around |
| MASE: | 5 test prop5 tren ace2 adex 2 proviron 5 test cyp All regular oil on these |
| SANTUCCI: | $1400 |
| MASE: | Ok |
| SANTUCCI: | You working tonight? |
| MASE: | Yes |

April 22, 2015:

| | |
|---|---|
| SANTUCCI: | I'll be at work whenever |
| MASE: | you get out |
| MASE: | Just got out |
| MASE: | Ready when u are |
| SANTUCCI: | Ready |
| MASE: | Ok gimmie 15 min |
| SANTUCCI: | K |
| MASE: | About to pull in |
| SANTUCCI: | Here |

133.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in the above WhatsApp message exchange, MASE places an anabolic steroid order with SANTUCCI, to which SANTUCCI responds with a price.  On the

following day, MASE and SANTUCCI complete the purchase in Newtown, Conneticut.

134.    On April 21, 2015, SANTUCCI informed MASE that he was in Newtown ("I'll be in newtown if your around"). MASE then ordered nineteen vials of steroids with SANTUCCI. The 19 vials of steroids include: five vials of Testosterone Propionate ("5 test prop"), five vials of Trenbolone Acetate ("5 tren ace"), two vials of Arimidex ("2 adex"), two vials of Proviron ("2 proviron"), and five vials of Testosterone Cypionate ("5 test cyp"). SANTUCCI responds with a price of $1,400 ("1400) for the steroid order. On April 22, 2015, MASE and SANTUCCI arranged to meet one another to complete the steroid purchase. Prior to arriving at the meet location, MASE stated that he is about to arrive ("About to pull in") to which SANTUCCI responds he is already there ("Here").

135.    On April 23, 2015, April 24, 2015, S and April 26, 2015, MASE utilizing (203) 241-7173 and SANTUCCI, utilizing the SANTUCCI Telephone exchanged a series of WhatsApp message communications in furtherance of a drug transaction.

April 23, 2015:

MASE:                5 tren ace 150 EO5 prop 150 EO 10 var2 anadrol

April 24, 2015:

MASE:                1 primo

SANTUCCI:            K

MASE:                When u think

SANTUCCI:            Tomorrow

SANTUCCI:            )1200

SANTUCCI:            $1200

MASE:                Ok cool

85

April 26, 2015:

| | |
|---|---|
| SANTUCCI: | On my way to work |
| MASE: | Ok I just got out |
| SANTUCCI: | Ok |
| SANTUCCI: | I'm here |

136.    Based on my training and experience, the training and experience of other special agents involved in this investigation, and information I have learned during the course of this investigation, I believe that in this "WhatsApp" text message exchange, MASE places an anabolic steroid order with SANTUCCI, to which SANTUCCI responds with a price on the following day. Two days after the steroids order, MASE and SANTUCCI complete the transaction.

137.    On April 23, 2015, MASE orders twenty-two vials of steroids with SANTUCCI. The twenty-two vials of steroids include: five vials of Trenbolone Acetate ("5 tren ace 150 EO"), five vials of Propionate ("5 prop 150 EO), 10 vials of Anavar ("10 var") and two vials of Anadrol ("2anadrol"). On April 24, 2015, SANTUCCI responds to MASE with a price of $1,200 ("$1200).

138.    On April 26, 2015, MASE and SANTUCCI meet one another.  SANTUCCI states that he is on his way to work, which investigators understood to be the Newtown Police Department ("On my may way to work"). MASE states that he has left work ("Ok I just got out") to which SANTUCCI responds that he is at his work ("I'm here").

139.    Based on my training and experience, I believe that the quantity and frequency of MASE's steroids purchases demonstrate that he is redistributing the steroids.

**12.**   **International Shipments of Packages to SANTUCCI**

140.   During the course of the investigation, investigators have received information about certain packages that SANTUCCI has received at his residence located at 380 Hitchcock Road, Unit 147, Waterbury, Connecticut.  The packages have been described as coming from international origins, such as China, and containing the raw materials used in the manufacture of steroids.  The United States Customs and Border Protection advised that in 2012 and 2014 SANTUCCI was the intended recipient of two such packages, which were found to contain anabolic steroids and were seized.  Investigators have also confirmed with the United States Postal Service (hereinafter "USPS") that SANTUCCI has signed for and received some of the packages which USPS has identified as being delivered to 380 Hitchcock Road, Unit 147, Waterbury, Connecticut..  For example, on April 13, 2015, investigators received information that several international packages which were addressed to SANTUCCI had been received by SANTUCCI at his residence, 380 Hitchcock Road, Unit 147, Waterbury, Connecticut.  The international packages were delivered on February 21, 2015 from Guangzhou, China; March 7, 2015 from Hong Kong, China; March 7, 2015 from Toronto, Canada; March 8, 2015 from Toronto, Canada; March 11, 2015 from Hong Kong, China; March 11, 2015 from Hong Kong, China; March 25, 2015 from Poland; March 26, 2015 from the Ukraine; and March 30, 2015 from China.

141.   On March 30, 2015, investigators received information that a mail package originating in Wuhan, China was delivered to and signed for by SANTUCCI.  KENYHERCZ and BERTANZA were intercepted on March 30, 2015 discussing a package of "tren" (Trenbolone, a type of steroid) that SANTUCCI was waiting to receive to complete the BERTANZA KENYHERCZ order.  Subsequent to delivery of the package, investigators

completed a controlled purchase of steroids to include Trenbolone steroids.

142.   I have also learned that SANTUCCI tracked the progress of the packages from a computer or from a smartphone.

### 13.   SANTUCCI's Financial Transactions

143.   I have examined financial records relating to SANTUCCI, including, but not limited to bank records, credit card records and Western Union records.

144.   From May 2011 through November 2014, SANTUCCI received direct deposits of his salary totaling approximately $156,893.46 into his bank account.  Additionally, SANTUCCI made approximately $244,391.00 in cash deposits into his account, and deposited a further $46,514.00 into his bank account by ATM.  In another account, SANTUCCI made deposits of $5,525.41 and ATM deposits of $12,284.05.  Based on my training and experience and investigation into this case, I believe that the deposits beyond SANTUCCI's salary are narcotic and counterfeit prescription sale proceeds.

145.   From April 2011 through November 2014, SANTUCCI charged approximately $310,648.92 on two credit cards.  Included in his charges were international travel to Europe, South America and Africa (over $30,000 in charges for an African safari), and domestic travel to 23 states plus the District of Columbia, as well as $25,818 spent on Celebrity Cruises.  During this time period, SANTUCCI charged approximately $111,651.92 for lodging expenses, including $17,116.76 spent at Four Seasons Resorts, $19,422.68 spent at Hyatt and Grand Hyatt hotels, and $7,195.61 spent at Ritz Carlton hotels

146.   Also included among SANTUCCI's credit card purchases during this time period were over $28,000 in internet purchases of glassware and supplies, from entities including E Bottles.com, which I know from my training and experience to be companies that supply

packaging materials, which could be used for steroids.

147.    From June 2011 to September 2013, SANTUCCI made Western Union transfers of approximately $103,000 to China.  Based on my training and experience, I know that purveyors of controlled substances, counterfeit prescription medications, and listed chemicals that operate out of China offer those items for sale on the internet, for example on Alibaba.com. Purchasers based in the United States, where the substances are illegal, often pay for the items through international money remitters, including Western Union.

148.    Additionally, since September 2013, SANTUCCI has made or caused to be made Western Union payments to Asia in the name of his wife.

## VI.    Basis for Search Warrants

149.    Based on the foregoing, I believe there is probable cause to believe that SANTUCCI is engaged in illegally importing controlled substances, manufacturing controlled substances, distributing controlled substances and laundering the proceeds of such importation, manufacture and distribution from his residence, at 380 Hitchcock Road, Unit 147, Waterbury, Connecticut, described and pictured in Attachment A (hereinafter "Subject Premises One"). Further, there is probable cause to believe that evidence, fruits or instrumentalities of the illegal importation, manufacturing, and distribution of controlled substances and counterfeit prescription medicines, including evidence, fruits and instrumentalities of the crimes of Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846 (Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances), Title 21, United States Code, Section 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony), Title 21, United States Code, Section 952 (Importation of Controlled Substances), Title 18, United States Code, Section

2320(a)(4)(Trafficking in Counterfeit Goods) and Title 18, United States Code, Sections 1956 and 1957 (Laundering Monetary Instruments) will be found at SANTUCCI's residence of 380 Subject Premises One and the garage attached to it. Further, investigators believe that SANTUCCI is utilizing two cellular telephones in furtherance of his drug distribution activities. Investigators believe that one telephone is associated with telephone number 203-671-1294 (referenced as being used throughout this affidavit) and a second telephone of which is referenced in SANTUCCI Session 199 as being utilized by SANTUCCI.

150.    During the course of the investigation, and as previously detailed within this affidavit, investigators believe that SANTUCCI received international mail packages at his residence of Subject Premises One that contained the raw materials utilized to manufacture controlled substances. Additionally, it was reported to the DEA that in July 2011, SANTUCCI received a capsule filling/tableting machine at his residence of Subject Premises One. During the course of the investigation, investigators have conducted physical surveillance of SANTUCCI where he has been observed traveling to his residence. Specifically, SANTUCCI has been observed driving into the garage, which is attached to his residence. Most recent surveillance efforts of SANTUCCI, where he was observed at his residence, were conducted on April 21, 2015 and again on April 22, 2015. On both of these dates, SANTUCCI was observed traveling to his residence.

151.    On April 25, 2015, and as previously detailed within this affidavit, surveillance observed SANTUCCI arrive at the Newtown Police Department. On this date investigators believe that SANTUCCI completed a drug transaction with CHICKOS at the police department. During the intercepted WhatsApp communications, SANTUCCI explained that he was manufacturing ("working on") the steroids and would meet CHICKOS at the police department.

Information provided by Verizon Wireless, show SANTUCCI in the same geographic region as his residence at the time SANTUCCI stated he was manufacturing the steroids. Investigators believe that while steroids are by their nature "consumed" the components used to manufacture the steroids, including the capsule/tableting machine, as well as related records may remain at the residence.

152.   In addition, based on the foregoing, I believe there is probable cause to believe that KENYHERCZ is engaged in illegally distributing controlled substances from his residence, at 53 Francis Street, Ansonia, Connecticut, described and pictured in Attachment B (hereinafter "Subject Premises Two"). Further, there is probable cause to believe that evidence, fruits or instrumentalities of the illegal distribution of controlled substances and counterfeit prescription medicines, including evidence, fruits and instrumentalities of the crimes of Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846 (Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances), Title 21, United States Code, Section 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony), Title 21, United States Code, Section 952 (Importation of Controlled Substances),   and Title 18, United States Code, Section 2320(a)(4)(Trafficking in Counterfeit Goods) will be found at Subject Premises Two. Further, investigators believe that KENYHERCZ is utilizing a cellular telephone in furtherance of his drug distribution activities. Investigators believe that the telephone is associated with telephone number 203-343-6495 (this telephone number is referenced as being used throughout this affidavit).

153.   On numerous occasions during the course of the investigation, investigators have observed KENYHERCZ traveling to and from his residence at Subject Premises Two after

having completed drug transactions with various subjects of the investigation. Additionally, investigators have observed KENYHERCZ complete suspected drug transactions at his residence and directly outside of his residence with various subjects of the investigation.

154.    On April 20, 2015, surveillance observed KENYHERCZ standing by the passenger side of TW's 2013 Lexus RX300, color silver, Connecticut registration 736YAU, which was parked in the middle of the street in front of KENYHERCZ's residence at Subject Premises Two.  After KENHERCZ met with the operator of the vehicle, surveillance observed KENYHERCZ return to his residence of Subject Premises Two.  Based on preceding telephone calls between KENYHERCZ and TW, investigators believe that KENYHERCZ had completed a drug transaction and hence transported drug proceeds into his residence.  Investigators believe that there is evidence related to KENYEHRCZ's drug trafficking activities at his residence of Subject Premises Two.

155.    Based upon the totality of the facts and circumstances set forth herein, my training and experience, my personal involvement with this case, consultations with fellow law enforcement officers, and my familiarity with the practices and methods of narcotics trafficking, I know that:

   a.  narcotics traffickers must maintain on hand U.S. currency in order to maintain and finance their on-going narcotics business;

   b.  narcotics traffickers maintain books, records, receipts, notes, ledgers, money orders and other papers relating to the transportation, receipts, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where traffickers have ready access to them, including within their stash houses, residences and automobiles;

c.  persons involved in narcotics trafficking conceal in their residences, stash houses or within their automobiles caches of drugs, scales, drug packaging materials, cutting agents and diluents, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions; and the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from narcotics trafficking activities;

d.  it is common for narcotics traffickers to hide contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, stash houses or within their automobiles for ready access and for concealment of these items from law enforcement authorities;

e.  narcotics traffickers commonly utilize cellular telephones to conduct their drug trafficking business and that they maintain addresses or telephone numbers in books, papers, cellular telephones or electronic organizers which reflect names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization.  Traffickers also maintain photographs and videotapes of participants and associates in narcotic trafficking activity, and property acquired as a consequence of narcotics trafficking activities;

f.  narcotics traffickers commonly have in their possession, or at their residences, stash houses and in their automobiles police scanners used to detect law enforcement activity, and firearms, ammunition and other weapons that are used to protect and secure a narcotics trafficker's property and

156.  Specifically, the type of evidence that is typically found at a location from which

a drug trafficker operates, and which I anticipate seizing, includes, but is not limited to: United States currency and other financial instruments that may constitute proceeds of drug transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities; records, notes, ledgers and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances; photographs and videotapes of participants and associates in narcotic trafficking activity, including those contained within cameras, computers, cell phones and other personal electronic devices; contraband, quantities of narcotics, scales, residue of narcotics, storage containers for controlled substances, including glass vials; cutting agents and other drug paraphernalia used to manufacture controlled substances or counterfeit prescription drugs; addresses or telephone numbers in books, papers, cellular telephones or electronic organizers and their electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in narcotic trafficking activity; police scanners; firearms, ammunition and other weapons; key-lock and combination safes and other secure storage containers and their contents; identification documents and keys evidencing a possessory interest in the premises, vehicles and storage containers, all of which constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and/or Title 18, United States Code, Section 922(g).

157.     Based on my investigation, and the investigation of others, there is probable cause to believe and I do believe that the items set forth above, all of which constitute contraband, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and/or and Title 18, United States Code, Section 922(g), will be found at **Subject Premises One** and **Subject Premises Two**.  These items would constitute evidence of and a means of

94

committing the criminal offenses referred to above, and would be instrumentalities of the commission of federal narcotics trafficking offenses

158.    At the time of execution of the arrest warrants and the search warrants, the investigators anticipate locating the Santucci Telephone and the Kenyhercz Telephone, in addition to other cellular telephones and computers.

159.    As described above and in Attachment C, this application seeks permission to search for records that might be found on the Subject Premises One and Two (hereinafter "the Subject Premises"), in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

160.    *Probable cause.*  I submit that if a computer, cellular telephone or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that compute, cellular telephone, or storage medium (hereinafter "computer files"), for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files whether from a computer or a smart cellular telephone can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data

contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

161.   *Forensic evidence.*  As further described in Attachment C, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable

cause to believe that this forensic electronic evidence will be on any storage medium in the
Subject Premises because:

    a. Data on the storage medium can provide evidence of a file that was once on the
storage medium but has since been deleted or edited, or of a deleted portion of a file
(such as a paragraph that has been deleted from a word processing file). Virtual
memory paging systems can leave traces of information on the storage medium that
show what tasks and processes were recently active. Web browsers, e-mail programs,
and chat programs store configuration information on the storage medium that can
reveal information such as online nicknames and passwords. Operating systems can
record additional information, such as the attachment of peripherals, the attachment
of USB flash storage devices or other external storage media, and the times the
computer was in use. Computer file systems can record information about the dates
files were created and the sequence in which they were created, although this
information can later be falsified.

    b. As explained herein, information stored within a computer and other electronic
storage media may provide crucial evidence of the "who, what, why, when, where,
and how" of the criminal conduct under investigation, thus enabling the United States
to establish and prove each element or alternatively, to exclude the innocent from
further suspicion. In my training and experience, information stored within a
computer or storage media (e.g., registry information, communications, images and
movies, transactional information, records of session times and durations, internet
history, and anti-virus, spyware, and malware detection programs) can indicate who
has used or controlled the computer or storage media. This "user attribution"

evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example,

information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer or smart cellular telephone to

distribute controlled substances, the individual's computer or smart cellular telephone will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer or smart cellular telephone is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer or smart cellular telephone is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer or smart cellular telephone used to commit a crime of this type may contain: data that is evidence of how the computer or smart cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

162. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires

considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers and smart cellular telephones can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

163. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the

warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

164.    Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

165.    This application requests the issuance of a warrant under 21 U.S.C. § 853(f) authorizing the seizure of property, including but not limited to the Santucci Telephone and the Kenyhercz Telephone, subject to forfeiture. This is appropriate because: (1) there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture, and (2) an order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture. There is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture, because 18 U.S.C. § 1030(i)(1)(A) provides that the defendant's "interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such violation" shall be forfeited to the United States.

## VIII. **Conclusion**

166.    On the basis of the foregoing information, there is probable cause to believe, and I do believe, that during the periods set forth above SANTUCCI, KENYHERCZ, BERTANZA, CHICKOS, GENTILE, MASE, PECORA, FERNANDES and others, have committed the offenses of conspiracy to distribute and to possess with intent to distribute narcotics, in violation

102

of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and 846, and use of a communications facility in furtherance of a narcotics trafficking felony, in violation of Title 21, United States Code, Section 843(b). Accordingly, I request the issue of arrest warrants authorizing their arrests. Additionally, I believe there is probable cause to support the execution of search warrants on: (1) 380 Hitchcock Road, Unit 147, Waterbury, Connecticut (see Attachment A); and (2) 53 Francis Street, Ansonia, Connecticut (see Attachment B) for items described in Attachment C.

## IX.  Sealing

167.    Finally, I believe that premature disclosure of this affidavit and its attachments at this time will jeopardize the government's ongoing investigation in the District of Connecticut. Accordingly, I request that this affidavit and the accompanying applications, warrants and orders be ordered sealed until further order by the Court.

Dana Mofenson
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 29th day of April, 2015, at New Haven Connecticut.

/s/
SARAH A.L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

103