UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:15CR70 (RNC) |
| | : | |
| v. | : | |
| | : | |
| STEVEN SANTUCCI | : | August 22, 2016 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in connection with defendant Steven Santucci's ("Santucci" or "defendant") sentencing, which is currently scheduled for August 25, 2016.   The Government respectfully submits that Santucci's sentence should reflect the egregious breach of trust and abuse of power that his conduct entailed.

### Background

I.     **Factual background**

In approximately October 2014, the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), and Homeland Security Investigations ("HSI") began an investigation into several individuals who were connected to a Newtown, Connecticut Police Department sergeant who was manufacturing anabolic steroids for distribution. In late February, 2015, after six months of investigation that included several controlled purchases of anabolic steroids, the DEA, FBI and HSI (hereinafter "the agencies") received authorization to intercept telephone calls and text messages over co-defendants Mark Bertanza's and Alex Kenyhercz's cellular telephones. By March 2015, the agencies received authorization to intercept electronic and wire communications over Santucci's personal cellular telephone. During the two plus months of interceptions, it became clear that Santucci was manufacturing large quantities of anabolic steroids and pharmaceutical drugs and distributing his products to other steroid resellers, most of who were

in or had been in law enforcement positions.   Specifically, it became apparent that Santucci, a law enforcement officer who was aware of law enforcement techniques, had instructed his redistributors to use an application called "What's App" in an effort to minimize any risk of law enforcement learning of the conspiracy.   The thorough Pre Sentence Report ("PSR") contains a number of the intercepted conversations, which demonstrate that in addition to using What's App, Santucci and his co-conspirators still relied on code to communicate their drug orders.

For example, on On February 7, 2015, Jason Chickos, using telephone number (203) 993-0921, and Santucci, using the Santucci Telephone, engaged in the following text message exchange:

CHICKOS:           When u working again

SANTUCCI:          Tonight

SANTUCCI:          And tomorrow

SANTUCCI:          Oh. I I had the missing item for today. I'll try for rest tomorrow

CHICKOS:           K.

CHICKOS:           Also VAVAVA, SUSU, DB, WIWIWIWI

CHICKOS:           I'm working at 3pm again tmrw.

SANTUCCI:          K.

The agents believe that in this text message exchange, Chickos asked Santucci when he would be working at the Newtown Police Department ("When u working again") and Santucci responded that he was working that night and the following day ("Tonight", "And tomorrow"). Santucci continued that he had the steroids for Chickos that he had originally promised him in the text message exchange on February 6, 2015 ("Oh. I I had the missing item for today.") and that he would get Chickos the remainder of his steroid order the following day ("I'll try for rest

tomorrow").   Chickos added three bottles of Vanazolol, two bottles of Sustanon, a single bottle

of Dianabol, and four bottles of Winstrol to his previous steroid order ("Also VAVAVA, SUSU,

DB, WIWIWIWI").   Santucci responded that he understood Chickos' additional steroid order

("K").

        During the course of the investigation, investigators confirmed with the United States

Postal Service (hereinafter "USPS") that Santucci has signed for and received some of the

packages which USPS has identified as being delivered to Santucci's apartment, Waterbury,

Connecticut.   For example, on April 13, 2015, investigators received information that several

international packages which were addressed to Santucci had been received by Santucci at his

residence, 380 Hitchcock Road, Unit 147, Waterbury, Connecticut.   The international packages

were delivered on February 21, 2015 from Guangzhou, China; March 7, 2015 from Hong Kong,

China; March 7, 2015 from Toronto, Canada; March 8, 2015 from Toronto, Canada; March 11,

2015 from Hong Kong, China; March 11, 2015 from Hong Kong, China; March 25, 2015 from

Poland; March 26, 2015 from the Ukraine; and March 30, 2015 from China. The packages

contained raw materials for the production of steroids, which Santucci then assembled into final

products.   The investigation revealed that between June 2011 and September 2013, Santucci made

Western Union transfers of approximately $103,000 to China.   Santucci also made credit card

purchases of over $28,000 from internet glassware suppliers, including E Bottles.com.   Santucci

used the purchases to bottle the final products and to label them.

        From May 2011 through November 2014, Santucci received direct deposits of his salary

totaling approximately $156,893.46 into his bank account.   In addition to his salary deposits,

Santucci made approximately $244,391.00 in cash deposits into his account with bank tellers, and

deposited a further $46,514.00 into his bank account by ATM; these non-salary deposits were the

proceeds of narcotic and counterfeit prescription drug sales.

From April 2011 through November 2014, Santucci charged approximately $310,648.92 on two credit cards.   Included in his charges were international travel to Europe, South America and Africa (over $30,000 in charges for a single African safari for Santucci and his wife), and domestic travel to 23 states plus the District of Columbia, as well as $25,818 spent on Celebrity Cruises.   During this time period, Santucci charged approximately $111,651.92 for lodging expenses, including $17,116.76 spent at Four Seasons Resorts, $19,422.68 spent at Hyatt and Grand Hyatt hotels, and $7,195.61 spent at Ritz Carlton hotels.

Between April 2011 and April 30, 2015, Santucci is responsible for between at least 60,000 units of anabolic steroids grams, the maximum amount under the Guidelines.   Additionally, Santucci has stipulated that he used over $120,000 in steroid-sale proceeds to purchase ingredients and glassware to manufacture and package steroids that he subsequently sold for even more profit.

## II.    Procedural history

On June 3, 2015, a Grand Jury sitting in Bridgeport, Connecticut, returned a twelve-count superseding indictment charging Santucci and ten other individuals with a variety of narcotics and firearms trafficking offenses. Santucci was charged in Count One with conspiracy to distribute and to possess with intent to distribute anabolic steroids, in violation of Title 21, U.S.C., Sections 846, 841(a)(1), 841(b)(1)(e); in Counts Three to Eight with Possession with Intent to Distribute and Distribution of Anabolic Steroids, in violation of Title 21, U.S.C., Sections 841(a)(1), 841(b)(1)(e); and in Count Nine with Conspiracy to Launder Monetary Instruments, in violation of Title 18, U.S.C., Section 1956(h).

On December 30, 2015, the defendant pled guilty to Count One of the Superseding Indictment charging him with conspiracy to distribute and to possess with intent to distribute

anabolic steroids, and Count Nine, charging him with conspiracy to launder monetary instruments. The parties agreed in their plea agreement that: (1) the defendant fell within Criminal History Category I, (2) the quantity of narcotics that was part of the defendant's relevant and readily foreseeable conduct was greater than 60,000 units, resulting in a base offense level of 20, (3) two levels were added because the defendant maintained a premises for manufacturing anabolic steroids; (4) two further levels are added because he is convicted under Title 18, United States Code, Section 1956; (5) a further two levels were added because he was an organizer/leader of criminal activity; (6) two more levels are added because he imported controlled substances, and (7) three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility.   The resulting total offense level of 25, when matched with a Criminal History Category 1, yields an advisory Guidelines range of 57-71 months.

### III.    The Presentence Report

On July 7, 2016, the Probation Department found the defendant's applicable base offense Level 24 (U.S.S.G. §§ 2S1.1).   PSR ¶50.   The PSR adds a further 2 levels because Santucci was convicted under Title 18, United States Code, Section 1956, and an additional 2 levels because he was an organizer, leader manager, or supervisor of criminal activity.   PSR ¶¶ 51, 53.   A further three points are subtracted for the defendant's prompt acceptance of responsibility resulting in an Adjusted Offense Level of 25.   PSR ¶¶ 57-59.   With a Criminal History Category of I, the resulting Guidelines range for the defendant is 57 to 71 months of imprisonment.   PSR ¶¶ 61, 89.

The Government agrees with the PSR's calculations.

<u>Argument</u>

I.     **In light of the egregious nature and circumstances of the crime, and the significant breach of the public trust, Santucci merits the longest sentence of his co-conspirators.**

   **A.  Governing law and standard of review**

   A district court is expected to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and to use that range as "the starting point and the initial benchmark" for its decision. *See Gall v. United States*, 552 U.S. 38, 49 (2007). Under the Sentencing Guidelines, the court must begin by determining the defendant's "base offense level," U.S.S.G. § 1B1.1, which is calculated based on:

   (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

   (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . .

U.S.S.G. § 1B1.3(a)(1).

   In a drug case, this Guideline requires a determination of the quantity of drugs attributable to the defendant, and, in the case of a drug conspiracy, the quantity reasonably foreseeable to him. *See United States v. Jones*, 531 F.3d 163, 174-75 (2d Cir. 2008); *United States v. Payne,* 591 F.3d 46, 70 (2d Cir.), *cert. denied*, 131 S. Ct. 74 (2010). "The quantity of drugs attributable to a defendant is a question of fact" that the government must prove by a preponderance of the evidence. *See Jones*, 531 F.3d at 175.

   The Guidelines provide that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1, n. 12; *see also Jones*, 531 F.3d at 175. All transactions entered into by a defendant's coconspirators may be attributable to him, if they were known to him or

reasonably foreseeable by him. *See United States v. Miller*, 116 F.3d 641, 684 (2d Cir. 1997). "In deciding quantity involved, any appropriate evidence may be considered, or, in other words, a sentencing court may rely on any information it knows about." *United States v. Jones*, 30 F.3d 276, 286 (2d Cir. 1994) (citations omitted).

**B.  Consideration of whether to impose a Guideline sentence**

After the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005) rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir.), cert. denied, 127 S. Ct. 192 (2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.  *See* 18 U.S.C. § 3553(a). Here, several factors demonstrate that a sentence within the agreed-upon Guideline range, as is reasonable.

**C. The Section 3553(a) Factors**

      1.     <u>The Nature and Circumstances of the Offense</u>

The seriousness of former Sergeant Steven Santucci's conduct in illegally manufacturing and distributing steroids and counterfeit prescription pills cannot be overstated. Ostensibly working to keep the people of Newtown safe during working hours, he single-handedly staffed a clandestine steroids laboratory and oversaw the distribution of steroids and counterfeit prescription pills by others from his Waterbury home after work. Santucci also used knowledge he gained as a police officer and investigator to ensure that his operation remained clandestine. Thus, Santucci instructed his distributors to place orders through What's App, a form of communication that he believed to be much more surreptitious. Santucci also made sure that he only maintained a small circle of redistributors, most of whom were public employees. To be sure, Santucci did not use his position as a public employee to further his steroid sales, but Santucci did blur this division of roles, providing co-defendant Jason Chickos with steroid orders in the Police Department itself.

An analysis of Santucci's bank deposits shows that his net take-home salary actually decreased as the conspiracy progressed; from May 2011 until November 2014, Santucci took home twice as much (approximately $300,000) from drug sales than he did from his job as a police sergeant (approximately $150,000). Obviously, Santucci relinquished overtime work for the lavish vacations he purchased with his ill-gotten steroid sales. In fact, on December 14, 2012, Santucci was skiing.

The impact of Santucci's steroid manufacturing and distribution operation also had negative health effects on end-users and impacted the public safety. This Court recently heard from co-defendant Frank Pecora that he became ill from using Santucci's steroids. The DEA received reports of users being infected with MERSA. A conversation intercepted on April 26,

2015 between two of Santucci's co-defendants, Jeffrey Gentile and Alex Kenyhercz was of particular concern due to the prospective violence discussed:

GENTILE:        Like that shit ain't good.   Yo, I felt, like yo, I'm done.   But then I got so mad, yo, I was like on a deathwish with dude yo.   Like I've never felt that way before.   I was like yo I grabbed my shotgun, I went down to Bridgeport, I was like I'm gonna die tonight yo, I'm gonna kill this dude.

KENYHERCZ:      Yeah.

GENTILE:        You know, and I mean, that's not good either.

KENYHERCZ:      Yeah.

GENTILE:        Like, it seemed like I had more control over the Tren.

KENYHERCZ:      Yeah, well like I said, it's not something, yeah, yeah, it could be part of the Test, but you know what it is, it's your estrogen levels, because what happens is when you take a shot you feel 3-4 days and it's after that, what's happening is your levels are getting so high after 3,4, 5, 6 weeks that your body is producing more estrogen to balance out your testosterone levels. So you got get something to get that  under control.   So, when I see you tonight, we're square away and I'll pick you up some fucking estrogen blockers.

GENTILE:        I appreciate it brother.

During this conversation, Gentile told Kenyhercz that he wanted to kill a man ("Like that shit ain't good.   Yo, I felt, like yo, I'm done.   But then I got so mad, yo, I was like on a death wish with dude yo.   Like I've never felt that way before.   I was like yo I grabbed my shotgun, I went down to Bridgeport, I was like I'm gonna die tonight yo, I'm gonna kill this dude.").   Gentile further explained that he believed he had control over his emotions when he was using an anabolic steroid Trenbolone ("Like, it seemed like I had more control over the Tren.").   Kenyhercz confirmed that part of Gentile's volatility could be due to the Testosterone he used ("it could be part of the Test").   Kenyhercz suggested that Gentile could use estrogen blockers to balance

Gentile's levels of Testosterone.

2.     Santucci's History and Characteristics

The comprehensive PSR reveals a man who had a positive upbringing and a loving wife. A college graduate who went on to become a law enforcement officer and a member of the Connecticut National Guard, Santucci should have known better.   Although Santucci now notes that he was addicted to the culture of body building, the enormous profits he made from his business, the lifestyle those profits entailed, and the accolades he received from the end-customers were likely a significant impetus for his illegal business.   Simply put, Santucci was not making personal use quantities of steroids and counterfeit Cialis.   Santucci catered to his customers' tastes, even changing steroid labels to please his customers.

Nonetheless, Santucci's conduct has shattered his loving family.  He has lost a well-paying job – he was next in line for the position of lieutenant – and the pension that goes along with that position.   When he has completed his sentence, with the assistance of the Probation Department, he should avail himself of counseling and assistance garnering employment.

3.     Deterrence.

Santucci's conviction has resulted in the loss of his job as a police sergeant.   His abhorrent behavior is not reflective of the law enforcement officers who proudly and positively serve the citizens of Connecticut.   A serious sentence, however, will send a strong message to any law enforcement official who might seek to emulate Santucci's conduct that such conduct will not be tolerated.

4. The Need to Avoid Unwarranted Sentencing Disparity

Santucci's peers in the steroid conspiracy have received sentences of probation.   Santucci,

however, is the head of the conspiracy and garnered palpable profits from the conspiracy.   His

sentence should be higher.

### <u>Conclusion</u>

The Government respectfully submits that Santucci's conduct merits a serious sentence.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/

RAHUL KALE
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv02526
United States Attorney's Office
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT 06604
(203) 696-3000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22, 2016, a copy of the foregoing was filed electronically, and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/

_____
RAHUL KALE
ASSISTANT U.S. ATTORNEY